## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KIALEGEE TRIBAL TOWN**<br>100 Kialegee Drive<br>Wetumka, Oklahoma 74883,<br><br>              Plaintiff,<br>v.<br><br>**RYAN K. ZINKE**,<br>Secretary<br>United States Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240<br><br>**MICHAEL BLACK**<br>Assistant Secretary for Indian Affairs<br>United States Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240<br><br>**UNITED STATES DEPARTMENT OF<br>THE INTERIOR**<br>1849 C Street, N.W.<br>Washington, DC 20240<br><br>**JONODEV OSCEOLA CHAUDHURI**<br>Chairman<br>National Indian Gaming Commission<br>90 K Street, N.E., Suite 200<br>Washington, DC 20002<br><br>              Defendants. | Civil Action No.:_____ |

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

### NATURE OF THE ACTION

Pursuant to Fed. R. Civ. Pro. 57, 28 U.S.C. §§2201 and 2202 and Fed. R. Civ. Pro. 65,

Plaintiff Kialegee Tribal Town (hereinafter referred to as "Kialegee")  seeks declaratory and

injunctive relief against the United States Department of the Interior ("Interior"), its Secretary Ryan Zinke, its Acting Assistant Secretary for Indian Affairs, Michael Black and the Chairman of the National Indian Gaming Commission, Jonodev Osceola Chaudhuri.

Plaintiff brings this action because each of the defendants has affirmatively and publicly announced their (wrongful) refusal to recognize Plaintiff's treaty-protected status and have duly stated that they will deny the protections to which Plaintiff is entitled.  Defendants incorrectly aver that Plaintiff does not have "shared jurisdiction" with the Muscogee Creek Nation over the Bruner allotment – also known as "jurisdiction in common" – which is land within the historical boundaries of the Creek Reservation in Eastern Oklahoma.

A case of actual controversy exists between Plaintiff and the defendants with respect to whether an Indian land allotment owned by Kialegee tribal member qualifies as Kialegee "Indian land for gaming" pursuant to the requirements of the Indian Gaming Regulatory Act of October 17, 1988, 25 U.S.C. §2701, *et seq.* ("IGRA").  IGRA defines "Indian land for gaming" at 25 U.S.C. §2703(4) and 25 U.S.C. §2719(a)(2)(A)(i).

As explained thoroughly in the following sections, the allotment owned by a Kialegee Tribal member is located within the Creek Reservation and absolutely qualifies as Indian Land for Gaming under IGRA.  Declaratory relief is warranted in order to recognize such status of the subject land, as is injunctive relief in order to prohibit Defendants from further denying such status and Plaintiff's rightful use thereunder.

## PARTIES

1.     Kialegee is an Indian Tribe that is federally recognized pursuant to the provisions of the Oklahoma Indian Welfare Act of June 26, 1936, 49 Stat. 1967 ("OIWA").  Plaintiff Kialegee submits that it, as a federally-recognized Indian Tribe and member of the historic Creek

nation, has jurisdiction over all lands within the Creek Reservation in common with two other federally-recognized Creek Tribal Towns and the federally recognized Muskogee Creek Nation ("MCN"), in accordance with provisions of various Creek treaties with the United States and as read in context with the Indian Canon of Construction.

2.      Sued in his official capacity, Ryan K. Zinke is Secretary of the United States Department of the Interior.

3.      Sued in his official capacity, Michael Black is Acting Assistant Secretary for Indian Affairs, United States Department of the Interior.

4.      The United States Department of the Interior is an executive department of the government of the United States of America.

5.      Sued in his official capacity, Jonodev Osceola Chaudhuri is Chairman of the National Indian Gaming Commission, which is the federal agency responsible for regulating Indian Gaming within the United States.

## JURISDICTION

6.      This Court has jurisdiction under 28 U.S.C. §§1331 and 2201 because this action is brought by a federally-recognized Indian Tribe with a governing body recognized by the Secretary of the Interior and presents questions arising under federal law.  The United States has consented to this action under 5 U.S.C. §§701-706.

## VENUE

7.      Venue is proper in this district under 28 U.S.C. §1391(e)(1) because the defendants reside and may be found here.

## FACTUAL BACKGROUND

8.      Kialegee is currently constructing a restaurant facility known as the Embers Grill –
and also known as Red Creek Dance Hall and Restaurant – which is located on an Indian
allotment within the Creek Reservation.  The land happens to be located within the city limits of
Broken Arrow, Oklahoma.  The allotment is owned by Bim Stephen Bruner, who is an enrolled
member of Kialegee.

9.      Kialegee is one of three Creek tribal towns in Oklahoma recognized under OIWA,
a federal statute.

10.      Kialegee claims jurisdiction over the Bruner allotment, as well as all lands within
the Creek Reservation, in common with the other recognized Creek tribes in Oklahoma.  This
shared jurisdiction is guaranteed by various Creek Treaties with the United States read in context
with the Indian Canon of Construction.

11.      The land is located within the boundaries of the Creek Reservation set aside for,
and occupied by, the Creek tribes constituting the former Creek Confederacy that was removed to
Oklahoma by the United States pursuant to treaty provisions.  The development plans for the
Bruner allotment include the potential development and operation of a gaming facility pursuant to
the provisions of the Indian Gaming Regulatory Act of October 17, 1988, 25 U.S.C. §2701, *et seq*.
("IGRA").   IGRA was enacted in order to "promot[e] tribal economic development, self-
sufficiency, and strong tribal governments." 25 U.S.C. §2702(1).  It provides a comprehensive
system to regulate gambling activities on Indian lands. *See id.* §§2701–2721, and explicitly states
that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the
gaming activity is not specifically prohibited by Federal law and is conducted within a state which

4

does not, as a matter of criminal law and public policy, prohibit such gaming activity." *Id.* at §
2701(5).

12.     As a Creek tribe, Kialegee is entitled to exercise all the rights guaranteed to and
understood by Creek Indians by various treaties with the United States.   These rights are
circumscribed by the Creek understanding of the nature of land ownership within the boundaries
of all Creek tribal lands at the time the applicable treaties were negotiated and executed.   At that
time, the historic political organization of the Creek Confederacy consisted of 44 tribal towns,
each of which had an equal voice and role in the Creek Confederacy government, and all land was
owned by each tribal entity in common with all the other tribal entities within the Creek
Confederacy.   As explained *infra*, this understanding is espoused by the applicable canons of
interpretation, as endorsed by the Supreme Court of the United States.

13.     In other words, this historic, accepted and treaty-protected understanding of land
ownership is that all land is owned by and between all Creeks, in common with one another.   This
understanding is relevant here, because it includes the principle that all Creek tribal entities share
an undivided ownership of all Creek lands and, consequently, joint jurisdiction over those lands.
It is under this recognized and federally-protected land interest that Kialegee has rightfully taken
initial actions to develop the Bruner allotment project.

14.     Defendants disagree.   They contend that there is no multi-tribal jurisdiction over
the former reservation lands and argue that the federally-recognized Muscogee Creek Nation
("MCN") is the only recognized Creek tribe with any jurisdiction over those lands.   This
interpretation is wrong on many levels.   At minimum, this contention would mean that Kialegee
and the other two federally recognized Creek tribal towns in Oklahoma have no jurisdiction over
any such lands despite (a) treaty guarantees to the contrary and (b) allotment ownership of their

enrolled members.  Defendants' rendition of the issue is that jurisdiction is mutually exclusive. This argument, whether for political reasons or for a miscomprehension of the law is wrong.

15.     Defendants have repeatedly violated 25 U.S.C. §476(f) by blocking the Kialegee from pursuing economic development opportunities on lands located within the Creek Reservation.

16.     25 USC §476 (f) mandates federal cooperation with recognized tribes:

> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 *et seq.,* 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

Section 476 (f) prohibits the Defendants from finding that the Kialegee lacks territorial jurisdiction while other tribes have territorial jurisdiction. Kialegee, like the Muscogee Creek Nation and the Alabama-Quassarte and Thlopthlocco Tribal Towns, possesses the authority to exercise territorial jurisdiction over its tribal lands.

17.     Most recently, Defendants have publicly declared their intention to take administrative and legal steps to oppose the Kialegee development of the Bruner allotment.

18.     Meanwhile, the development of the project continues and Kialegee anticipates commencing business operations within the next several weeks.

## COUNT I

### (Declaratory Judgment-Successor in Interest/Land Owned in Common)

19.     Plaintiff realleges and incorporates by reference paragraphs 1-18 above.

20.     Plaintiff seeks a declaration that the Kialegee Tribal is entitled to full treaty-guaranteed rights as a successor to the historic Creek Confederacy.

21.     Plaintiff's request is proper.  A declaratory judgment is appropriate when it will

"terminate the controversy" giving rise on undisputed or relatively undisputed facts. Advisory Committee Notes, Fed. R. Civ. P. 57. (emphasis added). **The existence or non-existence of any right, duty, power, liability, privilege, disability, or immunity or of any fact upon which such legal relations depend, or of a status, may be declared**. *Id*. **The petitioner must have a practical interest in the declaration sought and all parties having an interest therein or adversely affected must be made parties or be cited**. *Id*. (emphasis added).

22.    Here there is no question that Plaintiff's requested relief directly concerns the existence of a right, duty, power and/or privilege (its treaty-protected status as successor to the historic Creek Confederacy). There is likewise no question that Plaintiff has a practical interest in the declaration sought.

23.    The legal support for Plaintiff is clear. First, Kialegee has a well-established Tribal Gaming Commission and has secured three NIGC approvals of its Gaming Ordinance and amendments thereto. Those approvals were promulgated on October 23, 1997, April 9, 2009 and September 29, 2011. Copies of these administrative actions are posted on the NIGC web page and are incorporated by reference herein. Kialegee specifically has a Class III Gaming Compact with the State of Oklahoma that was approved on July 19, 2011. With this, Kialegee has a federally-recognized legal right to conduct both Class II and Class III gaming on "Indian land" as defined at 25 U.S.C. §2703(4). *See also* 25 U.S.C. §2719(a)(2)(A)(i).

24.    Second, the Indian Canon of Construction very clearly establishes (a) that the treaties and statutes applicable in this case are meant to be understood as the Indian signatories understood them at the time, i.e., that the treaties were signed on behalf of the **entire** Creek Nation, and (b) that said treaties and statutes should be construed liberally in favor of all Indians and never to their prejudice. This is stringently upheld. As Chief Justice John Marshall took

7

specific care to mention in *Worcester v. Georgia*, 31 U.S. 515, 582 (1832): "The language used in treaties with the Indians should never be construed to their prejudice."   Justice Harlan F. Stone did the same in *Carpenter v. Shaw*, 280 U.S. 363, 367(1930), where he wrote that ("[s]uch provisions [of agreements between Indians and the government] are to be liberally construed. Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith."

25.   Indeed and further supportive is that various treaties between the Creeks and the United States actually **guarantee Indian title to Creek Territory in new reservations**.  For example:

(a) .   The Creek Treaty of August 7, 1790, (7 Stat. 35) promised in Article 5: "The United States solemnly **guarantee** to the Creek Nation, all their lands within the limits of the United States to the westward and southward of the boundary described in the preceding article (Kappler 1904[2]:27).

(b)   The Creek Treaty of August 9, 1814, (7 Stat. 120) promised in Article 2: "The United States will **guarantee** to the Creek nation, the integrity of all their territory eastwardly and northwardly of the said line to be run and described as mentioned in the first article" (Kappler 1904[2]:108).

(c)   The Creek Treaty of January 8, 1821, (7 Stat. 215) **promised** in Article 2: "that the title and possession of the following tracts of land shall continue in the Creek nation so long as the present occupants shall remain in the personal possession thereof . . ." (Kappler 1904[2]:195-196).

(d)   The Creek treaty of February 12, 1825, (7 Stat. 237) **promised** in Article 2: " . . . that the United States will give, in exchange for the lands hereby acquired, the like quantity,

acre for acre, westward of the Missis<u>sippi</u>, on the Arkansas river, commencing at the mouth of the Canadian Fork thereof . . ." (Article 2). (Kappler 1904[2]:215) [Emphasis supplied.]

(e)     The Creek treaty of March 24, 1832, (7 Stat. 366) **stated** in Article 14: "<u>The Creek country west of the Mississippi shall be solemnly guarantied [sic] to the Creek Indians</u>, nor shall any State or Territory ever have a right to pass laws for the government of such Indians, but <u>they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them</u> . . . as soon as the boundaries of the Creek country West of the Mississippi are ascertained, [Congress shall] cause a <u>patent or grant</u> to be executed to the Creek tribe" (Kappler 1904[2]:343) [Emphasis supplied.]

(f)     The Creek Treaty of February 14, 1833, (7 Stat. 417) Preamble, **promised**: ". . . to establish boundary lines which will <u>secure a country and permanent home to the whole Creek nation of Indians</u> . . . ."  These words made clear that the Creek Reservation in Eastern Oklahoma was to be the "<u>permanent home to the whole Creek nation</u>" (Kappler 1904[2]:389-390) [Emphasis supplied.]

26.     In addition, the Creek Treaty of August 7, 1790, *supra,* **guaranteed protection for the Creeks against non-Indian encroachment** on Creek lands at Article 2: "American citizens would not [be] settled on Creek lands, hunt for game on Creek lands, or enter Creek lands without a passport (Kappler 1904[2]:27).

27.     Various Creek treaties **guaranteed money, goods and services** to the Creek Indians on their new lands in Oklahoma.

(a)     The Treaty of August 7, 1790, (7 Stat. 35) promised in Article 12:  "The United States will from time to time furnish gratuitously the said nation with useful domestic animals and implements of husbandry" (Kappler 1904[2]:28).

(b)     The Treaty of June 29, 1796, (7 Stat. 56) promised in Article 8: goods to the value of six thousand dollars, and stipulate to send to the Indian nation, two blacksmiths with strikers . . ." (Kappler 1904[2]:49).

(c)     The Treaty of June 16, 1802, (7 Stat. 68) promised in Article 2: "annually and every year, the sum of three thousand dollars, and one thousand dollars for the term of ten years, to the chiefs who administer the government . . .   Ten thousand dollars in goods and merchandise" (Kappler 1904[2]:58-59).

(d)     The Treaty of November 14, 1805, (7 Stat. 96) promised in Article 3: "twelve thousand dollars in money or goods, and implements of husbandry" and "two black-smiths and two strikers" (Kappler 1904[2]:86).

(e)     The Treaty of August 9, 1814, (7 Stat. 120) promised in Article 7:  "to furnish gratuitously the necessaries of life, until the crops of corn can be considered competent to yield the nation a supply" (Kappler 1904[2]:109).

(f)     The Treaty of January 22, 1818, (7 Stat. 171) promised in Articles 2 and 3: "the sum of twenty thousand dollars, and ten thousand dollars shall be paid annually for the term of ten succeeding years, without interest."  Further the United States "will furnish the Creek nation for three years with two black-smiths and strikers" (Kappler 1904[2]:156-157).

(g)     The Treaty of January 8, 1825, (7 Stat. 215) promised in Article 4: "there shall be paid to the Creek nation, by the United States, ten thousand dollars in hand . . . forty thousand dollars as soon as practicable after the ratification of this convention; five thousand dollars, annually, for two years thereafter; sixteen thousand dollars, annually, for five years thereafter; and ten thousand dollars, annually, for six years thereafter . . ." (Kappler 1904[2]:196).

(h)     The Treaty of February 12, 1825, (7 Stat. 237) promised in Article 7: "a

blacksmith and wheelwright for the said party of the second part, and give them instruction in agriculture, as long, and in such manner, as the President may think property" (Kappler 1904[2]:215).

28.     In addition, a common provision in virtually all the Creek treaties was a **Guarantee of Accurately Described Boundaries**.  Most of the Creek treaties contained verbal descriptions of lands ceded or lands reserved.  These narratives used geographical features to establish boundaries.  They included rivers, shoals, fords, banks, forks, mouths, landings, headwaters, creeks, swamps, fields, line intersections, distances in miles, acres, general directions such as "running westward," and other terms to delineate territory.  Virtually every Creek treaty employed descriptions of boundaries.

29.     The Kialegee Tribal Town is the successor-in-interest to various Creek entities – including tribal towns that formed the Creek Confederacy (i) prior to the treaty-making epoch, (ii) during removal to the Creek Reservation in Oklahoma and (iii) always since.

30.     Previous litigation related to this action was filed in 2012 and prosecuted in the United States District Court for the Northern District of Oklahoma.  See *State of Oklahoma v. Tiger Hobia, as Town King and member of the Kialegee Tribal Town Business Committee, et al.* (herein known as the "2012 Litigation.").  At issue in the 2012 litigation was whether Kialegee enjoyed "shared jurisdiction" – also known as "ownership in common" – over lands within the former Creek Reservation with other Creek tribes, including the Muskogee Creek Nation.

31.     The 2012 Litigation included a three-day hearing on the State's Motion for Preliminary Hearing, which featured testimony from the State of Oklahoma's Expert Witness, Dr. Gary Clayton Anderson, the George Lynn Cross Research Professor of History at the University of Oklahoma.  During cross examination, Dr. Anderson testified that the Indian Canon of

Construction mandates that any assessment of a treaty issue requires knowledge of what the treaty tribes understood at the time of treaty execution, and explained that this is an "important principle." *See* Transcript of Preliminary Injunction Hearing, May 16, 2012, Vol I, p.186, ll. 10-22.

32.     Dr. Anderson testified that the historical essence of property ownership among the Creek Indians [during the treaty epoch] in 1821 was that "**It was communal**." *Ibid.* at p.182, ll. 20-25 (emphasis added).

33.     Dr. Anderson testified that the understanding of Creek Indians during the negotiation and execution of treaties of removal from the Alabama and the other southeastern states to the Oklahoma reservation was that "the whole of the [new] reservation would be **commonly owned** once they were relocated." And he further asserted that this was "absolutely" the understanding of the Creek treaty signatories during the treaty epoch. *Ibid.* at p.195, ll. 20-24.

34.     Congress has never enacted a statute terminating Kialegee jurisdiction of its tribal lands within the Creek Reservation, and Defendants' attempts to exclude Kialegee from the legally guaranteed benefits conferred on **all** members of the Creek nation is totally unwarranted and legally untenable.

35.     On August 8, 2017, the United States Court of Appeals for the Tenth Circuit confirmed the treaty principles of shared jurisdiction and ownership of all Reservation lands "in common" when it ruled that there has never been any disestablishment of the Creek Reservation. *See Patrick Dwayne Murphy v. Terry Royal, Warden*, Docket Nos. 07-7068 and 15-7041.

36.     Among the attorneys who successfully briefed and ostensibly helped argue the *Patrick Dwayne Murphy* Tenth Circuit were the Attorney General and Assistant Attorney General for the Muskogee (Creek) Nation.

37. Considering the Tenth Circuit decision discussed at Paragraphs 30-31, *supra,* there can be no dispute between plaintiff and the Muskogee Creek Nation as to the uninterrupted and continuing existence of the Creek Reservation.

38. Kialegee is entitled to a declaratory judgment that it and its members have treaty-protected rights of shared jurisdiction within and ownership of the Creek Reservation in common with all other Creek tribes tracing to the Creek Confederacy within the State of Oklahoma.

## COUNT II

### (Injunction – Successor in Interest/Land owned in Common)

39. Plaintiff realleges and incorporates by reference paragraphs 1 through 38 above.

40. Kialegee is entitled to a mandatory injunction ordering the defendants to recognize that all of the lands within the Creek Reservation are Kialegee "Indian Lands" as that term is defined in in the Creek treaties and IGRA and immediately recognize and extend to Kialegee all of the rights and privileges to lands within the Creek Reservation that they now recognize and extend to any other Creek tribes tracing to the historic Creek Confederacy within the State of Oklahoma.

## COUNT III

### (Declaratory Judgment – Kialegee Tribal Town Status)

41. Plaintiff realleges and incorporates by reference paragraphs 1 through 38 and 40 above.

42. Kialegee is entitled to a declaratory judgment ordering the defendants to immediately recognize that all of the lands within the Creek Reservation are Kialegee "Indian Lands" as that term is defined in in the Creek treaties and IGRA, and to extend to Kialegee all of the rights and privileges to lands within the Creek Reservation that they now recognize and extend

13

to any other Creek tribes tracing to the historic Creek Confederacy within the State of Oklahoma, including the MCN.

## COUNT IV

### (Injunction – "Indian lands" Recognition)

43.     Plaintiff realleges and incorporates by reference paragraphs 1 through 38, 40 and 42 above.

44.     Kialegee is entitled to a mandatory injunction ordering the defendants to recognize that all of the lands within the Creek Reservation are Kialegee "Indian Lands" as that term is defined in the Creek treaties and IGRA, and immediately recognize and extend to Kialegee all of the rights and privileges to lands within the Creek Reservation that they now recognize and extend to any other Creek tribes tracing to the historic Creek Confederacy within the State of Oklahoma, including the MCN.

## REQUESTED RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter an order as follows:

**A.**     Declaring that the Creek Reservation has never been disestablished and is a reservation as to which Kialegee traces its ancestry and treaty rights to the historic Creek Confederacy within the State of Oklahoma, and which enjoys full treaty-guaranteed rights in common with all other Creek tribes that trace to the Creek Confederacy within the State of Oklahoma.

**B.**     Mandatorily enjoining the defendants to recognize the Kialegee's status as a tribe for which the Creek Reservation was established which enjoys all full treaty-guaranteed rights by the Creek treaties relevant to this litigation.

**C.**     Declaring that Kialegee and its members have treaty-protected rights of shared

jurisdiction within the Creek Reservation and ownership of the Creek Reservation in common with all other Creek tribes tracing to the Creek Confederacy within the State of Oklahoma.

    **D.**    Mandatorily enjoining the defendants to recognize the Kialegee's status as a tribe having treaty-protected rights of shared jurisdiction within the Creek Reservation and ownership of the Creek Reservation in common with all other Creek tribes tracing to the Creek Confederacy within the State of Oklahoma, and its members as having all the tribal rights owned by Kialegee.

    **E.**    Awarding plaintiff its costs, attorneys' fees, and all other expenses of this litigation.

    **F**.    Awarding plaintiff such other and further relief as the Court deems just and proper.

**DATED** this 17th day of August 2017.

                           **KIALEGEE TRIBAL TOWN, OKLAHOMA**

                                    _ s/ Dennis J. Whittlesey_____
                                    Dennis J. Whittlesey (D.C. Bar No. 053322)
                                    DICKINSON WRIGHT PLLC
                                    1875 Eye Street, N.W.
                                    Suite 900
                                    Washington, DC 2006-5403
                                    Tel:  (202) 457-0160
                                    Fax: (844) 670-6009
                                    dwhittlesey@dickinsonwright.com
                                    *Counsel for Plaintiff*

*Co-Counsel for Plaintiff*
Moises T. Grayson, Esq. (Pro Hac Vice Pending)
Tyler A. Mamone, Esq. (Pro Hac Vice Pending)
BLAXBERG, GRAYSON, KUKOFF & FORTEZA P.A.
730 Ingraham Building
25 Southeast Second Avenue
Miami, Florida 33131
Moises.Grayson@blaxgray.com
Tyler.Mamone@blaxgray.com