UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIALEGEE TRIBAL TOWN,<br>    Plaintiff<br>    v.<br>RYAN K. ZINKE, in his official capacity as SECRETARY of the DEPARTMENT OF THE INTERIOR, *et al.*,<br>    Defendants. | Civil Action No. 17-cv-1670 (CKK) |

**MEMORANDUM OPINION**
(September 7, 2018)

This suit arises from Plaintiff Kialegee Tribal Town's request that this Court grant declaratory and injunctive relief in its favor in connection with its claims that Plaintiff is a successor to the Creek Nation, and as such, has treaty-protected rights of shared jurisdiction over land within the boundaries of the historic Creek Nation reservation. Pending before this Court is Federal Defendants' Motion to Dismiss Plaintiff's Amended Complaint, brought by Ryan K. Zinke, in his official capacity as Secretary of the United States Department of the Interior; John Tahsuda, III, in his official capacity as Acting Assistant Secretary for Indian Affairs; and the United States Department of the Interior ("Interior") (collectively, the "Federal Defendants"). Federal Defendants have moved to dismiss Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure Rule 12(b)(1), for lack of subject matter jurisdiction, and Rule 12(b)(6), for failure to state a claim.

After reviewing the parties' submissions,[1] relevant case law and applicable statutory authority, the Court GRANTS Defendants' Motion to Dismiss on grounds that Plaintiff's Amended Complaint fails to state a claim. A separate Order accompanies this Memorandum Opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. History of the Creek Nation and Kialegee Trial Town

Plaintiff Kialegee Tribal Town ("Plaintiff" or "Kialegee") is "an Indian Tribe that is federally-recognized pursuant to the provisions of the Oklahoma Indian Welfare Act of June 26, 1936, 49 Stat. 1967." Am. Compl., ECF No. 27, ¶ 3.[2] This case centers on the issue of whether Plaintiff, a member of the historic Creek [N]ation, is included under the treaties signed by the historic Creek Nation. Plaintiff's position is that, "as a federally-recognized Indian Tribe and member of the historic Creek Nation, [it] has jurisdiction over all lands within the Creek Reservation as land owned in common with two other federally-recognized Creek Tribal Towns and the federally recognized Muskogee Creek Nation ("MCN") in accordance with treaties entered into between Kialegee and the United States and as read in context with the Indian Canon of Construction." *Id.* Defendant's position is that, "since the removal of the Creeks in 1832 to what is now Oklahoma, federal treaties and federal legislation pertaining to the Creek Reservation

---

[1] The Court's consideration focused on the following documents:
- Fed. Defs.' Mot. to Dismiss Pl.'s Am. Compl. ("Fed. Defs.' Mot."), ECF No. 28, and the Mem. of Points and Auth. in support thereof ("Fed. Defs.' Mem."), ECF No. 28-1
- Pl.'s Opp'n to Fed. Defs.' Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 30
- Fed. Defs.' Reply in Support of Mot. to Dismiss ("Fed. Defs.' Reply"), ECF No. 31.

In an exercise of discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

[2] While much of the historical background in this Memorandum Opinion derives from the Plaintiff's Amended Complaint, the Court has also referenced legislation and caselaw.

in Oklahoma have been exclusively with the Muscogee (Creek) Nation, not the tribal towns." Fed. Defs.' Mem. at 8.[3]

To put this argument in historic context, the Court looks briefly at the history of the Creek Nation. The Creek Nation, "historically and traditionally, is actually a confederacy of autonomous tribal towns, or Talwa, each with its own political organization and leadership." *Harjo* v. *Andrus*, 581 F.2d 949, 951 n.7 (D.C. Cir. 1978). "Between 1790 and 1866, the Creek Confederacy, as a collection of talwas, entered into several treaties with the United States[,]" and those treaties, which "collectively referred to a 'Creek Nation', the 'Creek Tribe' and 'the Creeks'" reserved lands to the "talwas and their larger use and subsistence areas held in common with other Creeks." Am. Compl. ¶ 44.[4]

After the ratification of the United States Constitution in 1788, the United States entered into a treaty with the Creeks on June 29, 1796 (the "1796 Treaty"), and one of the signatories to the 1796 Treaty is the Kialegee. *See* Am. Compl., Ex. A [1796 Treaty]. In March 1814, General Andrew Jackson led a force that killed more than 1,000 Creeks in Alabama during the Red Stick War, and that controversy was concluded by the Treaty of Fort Jackson (also known as the "Treaty With The Creeks, 1814"), which involved the Creeks' ceding 22 million acres of land in the Southeast United States to the United States. Am. Compl. ¶¶ 21-22; *see also* Am. Compl. Ex. B [Treaty With The Creeks, 1814]. Two signatories to the Treaty of Fort Jackson are identified as "Kialijee," designating the Kialegee people from the Kialijee Creek, "which was

---

[3] The page numbers cited herein reference the page numbers assigned by the Court's Electronic Case Filing ("ECF") system.

[4] Plaintiff references: (1) The Creek Treaty of August 7, 1790; (2) The Creek Treaty of August 9, 1814; (3) The Creek Treaty of January 8, 1821; (4) The Creek Treaty of March 24, 1832; and (5) The Creek Treaty of February 14, 1833. Some of these treaties are discussed in more detail in this Memorandum Opinion.

part of the Creek Confederacy as it existed in Alabama prior to removal." Am. Compl. ¶¶ 22-23.

"In the 1820's, the federal government adopted a policy to forcibly remove the Five Civilized Tribes [which included the Creek Nation] from the southeastern United States and relocate them west of the Mississippi River, in what is today Oklahoma."[5] *Indian Country, U.S.A., Inc. v. State of Oklahoma*, 829 F.2d 967, 971 (10th Cir. 1987) (citation omitted); *see* Am. Compl. Paragraphs 25-27. This policy became formal law on May 28, 1830, when then-President Andrew Jackson signed into law the "Indian Removal Act." Am. Compl. ¶ 26. This policy of removal "ultimately resulted in the forcible relocation of the Creek, Cherokee, Seminole, Choctaw and Chickasaw tribes to what is presently the state of Oklahoma." Am. Compl. ¶ 31. Plaintiff claims that Kialegee's "place as a Creek treaty tribe was established well before [this] removal period" because it was "a signatory to the 1796 Treaty." *Id.*

By means of the Treaty With The Creeks, 1832 ("Treaty of 1832"), the Creeks ceded their homelands in the eastern United States in exchange for lands in the western United States. *See* 7 Stat. 366 (1832) (stating that "The Creek country west of the Mississippi shall be solemnly guarantied [sic] to the Creek Indians[.]") (art. 14); Am. Compl. ¶ 27. The Creek Treaty of February 14, 1833, between the Creeks and the United States, was supposed to "establish boundary lines which [would] secure a country and permanent home to the whole Creek nation of Indians[.]" Am. Compl. ¶ 44(f) (emphasis omitted). By its terms, the Treaty of 1833 establishes that land assigned to the Creek Indians "shall be taken and considered the property of

---

[5] Plaintiff notes that "[t]he term "Five Civilized Tribes" was used by the United States during the mid-nineteenth century to refer to the Cherokee, Choctaw, Chickasaw, Creek, and Seminole nations," but the word "Civilized" was disrespectful because it "meant a qualification to exist for entire races based solely on their willingness to adopt norms and values unilaterally imposed on them by non-native peoples." Am. Compl. at 10, n. 6.

the whole Muscogee or Creek Nation, as well as those now residing upon the land." Am. Compl Paragraph 48. On June 14, 1866, a treaty was signed between the Creeks and the United States whereby the Creeks were to cede a western portion of their territory to the United States for payment in a certain amount. Am. Compl. ¶ 34 (citing Treaty of 1866, Art. III).

On October 12, 1867, the Creeks adopted a constitution and a code of laws for the "Muskogee Nation" (which differs from the present Muskogee Nation). Am. Compl. ¶ 36. "In 1893, Congress created the Dawes Commission to negotiate with the Five Civilized Tribes" to extinguish tribal land title and develop an allotment plan." *Indian Country*, 829 F.2d at 977 (citation omitted). In 1898, Congress enacted the Curtis Act, whereby "all land was taken from the entire Creek people, and allotments were given to tribe members of no more than 160 acres per tract." Am. Compl. ¶ 38.

### B. The Kialegee Tribal Town

In 1934, Congress passed the Indian Reorganization Act ("IRA") of 1934, ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 5101, *et seq.*), which was "designed to improve the economic status of Indians by ending the alienation of tribal land and facilitating tribes' acquisition of additional acreage and repurchase of former tribal domains." Fed. Defs.' Mem. at 11 (citing *Cohen's Handbook of Federal Indian Law*, Section 1.05 at 81 (Nell Jessup ed., 2012)). That Act provided for tribal self-government pursuant to tribally adopted constitutions. 25 U.S.C. § 5123. Pursuant to Section 5108, the Secretary of the Interior was authorized "to acquire . . . any interest in lands . . . for the purpose of providing land for Indians." 25 U.S.C. § 5108; *Match-E-Be-Nash-She Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 226 (2012) (recognizing that "[l]and forms the basis of [tribal] economic life, providing the foundation for tourism, manufacturing, mining, logging, . . . and gaming") (internal quotation marks and

5

citations omitted)). Certain sections of the IRA are inapplicable to tribes in Oklahoma. *See* 25 U.S.C. § 5118.

In 1936, Congress passed the Oklahoma Indian Welfare Act of 1936 ("OIWA"), which allowed "any recognized tribe or band of Indians residing in Oklahoma . . . . to organize for its common welfare and to adopt a constitution and bylaws, under such rules and regulations as the Secretary of the Interior may prescribe." Am. Compl. ¶ 40, n. 7. Plaintiff Kialegee is a federally recognized Indian tribe, organized under Section 3 of the OIWA, which first received federal recognition in 1936, and is governed in accordance with a constitution and bylaws that were approved by the Assistant Secretary of the Interior, on April 14, 1941, and ratified by the town members on June 12, 1941. Am. Compl. ¶ 41; *see Oklahoma v. Hobia*, 775 F.3d 1204, 1205 (10th Cir. 2014), *cert den.*, 136 S. Ct. 33 (2015). Kialegee also has a corporate charter that was approved by the Assistant Secretary of the Interior on July 23, 1942, and ratified by town members on September 17, 1942, which states that "[n]o property rights or claims of the Kialegee Tribal Town existing prior to the ratification of this Charter shall be in any way impaired by anything contained in this Charter [and further,] [t] the Tribal Town ownership of unallotted lands, whether or not occupied by any particular individuals, is hereby expressly recognized." Am. Compl. ¶¶ 41, 43 (referencing the Kialegee Corporate Charter at 6) (emphasis omitted).

C. **The Lawsuit**

Plaintiff filed its initial Complaint on August 17, 2017, against the Federal Defendants and the Chairman of the National Indian Gaming Commission ("NIGC"). Plaintiff sought a declaratory judgment that it exercises concurrent jurisdiction over the Creek Reservation in Oklahoma with all Creek tribes, and an injunction that all lands within the Creek Reservation are Plaintiff's "Indian lands" for purposes of the Indian Gaming Regulatory Act ("IGRA"). Compl.,

ECF No. 1, ¶¶ 38, 40, 42, 44. More specifically, Plaintiff referred to the construction of a restaurant facility known as the Red Creek Dance Hall and Restaurant, located on an Indian allotment within the Creek Reservation in Broken Arrow, Oklahoma, where the allotment was owned by Bim Stephen Bruner, an enrolled member of Kialegee (the "Bruner Allotment"). Compl., ECF No. 1, ¶ 8. Plaintiff indicated further that "Defendant [had] publicly declared their intention to take administrative and legal steps to oppose the Kialegee development of the Bruner allotment." Compl., ECF No. 1, ¶ 17.

In its Amended Complaint, for which a motion to amend was filed, unopposed, and leave to file was granted, Plaintiff deliberately removed the Chairman of the NIGC as a defendant and deleted several of the specific references to the Bruner allotment, seeming to focus instead on a more general request that this Court enforce Plaintiff's "rights" under historical treaties.[6] Plaintiff alleges that because Kialegee is a signatory to the Treaty of 1833 establishing the Creek Reservation, the Creek Reservation is also considered Plaintiff's Reservation and accordingly, Kialegee may exercise jurisdiction over lands within the boundaries of the historic Creek Reservation. Am. Compl., ECF No. 27, ¶¶ 2, 46-48, 56. Plaintiff alleges further that the "[Federal] Defendants' position is that the Muskogee Tribe alone exercises jurisdiction over the entirety of those lands that were explicitly reserved for the 'whole Creek Nation,'" Am. Compl. ¶¶ 51 (emphasis omitted), 64-65, and Defendants have "repeatedly violated 25 U.S.C. §[5123](f) by blocking [Plaintiff] from jurisdiction on lands located within the Creek Reservation." Am.

---

[6] Plaintiff's Complaint, dated August 17, 2017, initially focused more specifically on Defendants' opposition to the development of the Bruner allotment and Plaintiff's jurisdiction over that land, but because that issue was the subject of an April 26, 2017 decision by the Bureau of Indian Affairs, which was appealed to the IBIA, and Plaintiff had not exhausted its administrative remedies, Plaintiff shifted the focus in its Amended Complaint to an alleged general violation of its rights under various treaties.

Compl. ¶ 68.[7] In the instant case, Kialegee mentions its construction of a restaurant facility located on an Indian allotment within the Creek Reservation (the aforementioned "Bruner allotment"), and Kialegee claims jurisdiction over the land on which it is constructing the restaurant facility as well as all lands within the Creek Reservation, in common with other recognized Creek tribes in Oklahoma, based upon "various Creek Treaties with the United States read in context with the Indian Canon of Construction." Am. Compl. ¶¶ 56-57.

## II. LEGAL STANDARD

### A. Subject Matter Jurisdiction under Rule 12(b)(1)

A court must dismiss a case pursuant to Federal Rule 12(b)(1) when it lacks subject matter jurisdiction. In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.")

In reviewing a motion to dismiss pursuant to Rule 12(b)(1), courts must accept as true all

---

[7] Plaintiff references 25 U.S.C. Section 476(f) in the Amended Complaint, but that section was transferred to 25 U.S.C. Section 5123(f).

> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 . . ., or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. Section 5123(f).

factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Koutny v. Martin*, 530 F. Supp. 2d 84, 87 (D.D.C. 2007) ("[A] court accepts as true all of the factual allegations contained in the complaint and may also consider 'undisputed facts evidenced in the record'") (internal citations omitted). Despite the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint. . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted). A court need not accept as true "a legal conclusion couched as a factual allegation" or an inference "unsupported by the facts set out in the complaint." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasam v. Allain*, 478 U.S. 265, 286 (1986)).

### B. Failure to State a Claim under Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a party may move to dismiss a complaint on grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint is not sufficient if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on

9

its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "In evaluating a motion to dismiss, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 27 (D.D.C. 2006).

When considering a Rule 12(b)(6) motion, courts may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint" or "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. District of Columbia Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal quotation marks and citations omitted). The court may also consider documents in the public record of which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### III. ANALYSIS

When bringing a lawsuit against the United States, a plaintiff must identify: (1) a source of subject matter jurisdiction; (2) a waiver of sovereign immunity; and (3) a cause of action. *United American, Inc. v. N.B.C.-U.S.A. Housing, Inc. Twenty-Seven*, 400 F. Supp. 2d 59, 61 (D.D.C. 2005); *see also Am. Rd. & Transp. Builders Ass'n v. Envtl. Prot. Agency*, 865 F. Supp. 2d 73, 80 (D.D.C. 2012), (where the court noted with approval the Government's argument that neither statute relied upon by the plaintiff waived sovereign immunity nor provided a cause of action, and indicated further that the plaintiff needed to identify a source of jurisdiction), *aff'd per curiam*, 2013 WL 599474 (D.C. Cir. Jan. 28, 2013)

### A. Subject Matter Jurisdiction

There is no disagreement among the parties in this case that Plaintiff relies upon 28 § 1331, the federal question jurisdictional statute, and 28 U.S.C. § 1362, governing actions brought by tribes, to provide a source for this Court's subject matter jurisdiction. Am. Compl. ¶ 6. Pursuant to 28 U.S.C. § 1362, district courts are granted "original jurisdiction of all civil actions, brought by any Indian tribe or band with a government body duly recognized by the Secretary to the Interior, wherein the matter in controversy arises under the Constitution, laws or treaties of the United States." 28 U.S.C. §1362.

Plaintiff relies further on 25 U.S.C. § 5123 of the IRA as a source for subject matter jurisdiction. Am. Compl. ¶ 6; *see* 25 U.S.C. Section 5123(d)(2) ("Actions to enforce the provisions of this section may be brought in the appropriate Federal district court.) This Court notes however that "[t]he Act merely provides the authority and procedures whereby an Indian tribe may organize itself and adopt a tribal constitution and bylaws, [and it] makes no mention of jurisdiction in any sense and such is not within its purview." *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe*, 370 F.2d 529 (8th Cir. 1967).

Accordingly, Plaintiff has established a source for this Court's subject matter jurisdiction, pursuant to 28 U.S.C. Sections 1131 and 1362, which is uncontested by the Federal Defendants. The Court now turns to the issue of Federal Defendants' immunity from suit and whether Plaintiff has demonstrated a basis for waiving that immunity.

### B. Waiver of Sovereign Immunity

There is no dispute that the United States is immune from suit unless it consents to be sued. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Nor is there any dispute that, in suits against the government, a court must consider first, whether Congress provided an

affirmative grant of subject matter jurisdiction, and second, whether Congress waived the United States' immunity to being sued. *Yee v. Jewell*, 228 F. Supp. 3d 48, 53 (D.D.C. 2017). In its Opposition to Federal Defendants' Motion, Plaintiff acknowledges that "§ 5123, § 1331 and § 1362 have been determined not to waive sovereign immunity on their own." Pl.'s Opp'n at 14; *see Mackinac Tribe v. Jewell*, 87 F. Supp. 3d 127, 139 (D.D.C. 2015) ("[T]he IRA does not itself contain language that amounts to a waiver of sovereign immunity."), *aff'd*, 829 F.3d 754 (D.C. Cir. 2016), *cert denied*, 137 S. Ct. 638 (2017). Accordingly, in the absence of an express sovereign immunity waiver, Kialegee "must look beyond [its] jurisdictional statute[s] for a waiver of sovereign immunity with respect to [its] claim." *United States v. Mitchell*, 445 U.S. 535, 538 (1980).

Although Plaintiff affirmatively states that its cause of action is not based upon the Administrative Procedure Act (the "APA"), Plaintiff relies upon Section 702 of the APA to support a waiver of sovereign immunity. That Section provides that:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. <u>An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.</u> The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States:
> *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. Section 702 (emphasis added). Kialegee contends that because it seeks declaratory and injunctive relief, as opposed to monetary damages, it may rely upon the APA for a waiver of sovereign immunity. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (stating that "insofar

as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages"); *McKoy v. Spencer*, 271 F. Supp. 3d 25, 32 (D.D.C. 2017) (Kollar-Kotelly, J.) (finding that section 702 of the APA waived sovereign immunity as to plaintiff's claims for declaratory and injunctive relief). Nor does Kialegee need to allege the APA as a cause of action to benefit from waiver under Section 702. *Jack's Canoes & Kayaks v. Natl. Park Serv.*, 937 F. Supp. 2d 18, 35 (D.D.C. 2013) (citing *Trudeau v. Federal Trade Comm'n,* 456 F.3d 178, 186 (D.C. Cir. 2006)); *see also McKoy*, 271 F. Supp. 3d at 32 (to benefit from an APA waiver of sovereign immunity, a plaintiff need not even mention the APA in its complaint, but instead "[i]t is sufficient that Plaintiff correctly argued that the APA provides the requisite waiver of immunity in [its] opposition to Defendant's motion to dismiss.")

Federal Defendants concede that "a suit need not have been brought pursuant to the APA to receive the benefit of that statute's sovereign immunity waiver; indeed, the 'APA's waiver of sovereign immunity applies to any suit whether under the APA or not.'" *Z Street, Inc. v. Koskinen*, 44 F. Supp. 3d 48, 64 (D.D.C. 2014) (quoting *Chamber of Commerce v. Reich*, 74 F. 3d 1322, 1328 (D.C. Cir. 1996) (emphasis omitted)), *aff'd*, 791 F.3d 24 (D.C. Cir. 2015). Federal Defendants contest however whether Kialegee has fulfilled the requirement of Section 702 in terms of stating a claim that "an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." Fed. Defs' Mem. at 17-18 (citing Section 702); *see Mackinac Tribe*, 87 F. Supp. 3d at 142 (noting that a Section 702 waiver applies when the two requirements therein — an agency, officer or employee acts or fails to act in an official capacity or under color of authority, and the relief sought is in a form other than money damages — have been met).

Federal Defendants interpret Section 702 as requiring a "final agency action," but the

*Mackinac Tribe* case makes it clear that a "final agency action" is not required. In that case, "although Defendant argue[d] that Plaintiff need[ed] to fulfill an additional requirement in order to be able to rely on the APA's sovereign immunity waiver — namely, that the agency action that Plaintiff s[ought] to challenge must be a "final" agency action . . . [the Court found that] the D.C. Circuit rejected this very argument in *Trudeau v. Federal Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006)." *Mackinac*, 87 F. Supp. 3d at 142-3 (internal citations and quotation marks omitted). Plaintiff cites *Trudeau* for the proposition that "even though what plaintiff had complained of was not even "agency action" at all as defined in the APA, let alone "final," it made no difference" because two of the plaintiff's causes of action therein did not involve judicial review under the APA. Pl.'s Opp'n at 16; *see Trudeau*, 456 F. 3d at 187. In *Trudeau*, the Court of Appeals concluded that there was jurisdiction pursuant to 28 U.S.C. Section 1331, and a waiver of sovereign immunity pursuant to Section 702 of the APA because the plaintiff sought a declaratory judgment and injunction, and he stated a claim based on an FTC press release. *Id*. at 185-87.

Federal Defendants challenge whether Plaintiff has "stat[ed] a claim" regarding any specific agency action or inaction, which is sufficient to comply with Section 702. Federal Defendants argue that "[a]lthough Plaintiff asserts that Federal Defendants have not recognized it as part of the "whole Creek Nation," Am. Compl. ¶ 2, Plaintiff fails to cite to any discrete [ ] decision made by Federal Defendants. [and] instead cites to positions it believes Federal Defendants will take or arguments Federal Defendants may assert." Fed. Defs.' Mem. at 20; *see* Am. Comp. ¶¶ 19, 39, 49, 50, 51, 64, 65, 68, 73. Plaintiff asserts however that "Kialegee [ ] "need not identify any "agency" action or inaction, as made clear under *Trudeau*." Pl.'s Opp'n at 18. (emphasis added). In *Trudeau*, the Court of Appeals noted that "[w]hile the [second] sentence [of Section 702] does refer to a claim against an "agency" and hence waives immunity

14

only when the defendant falls within that category, it does not use either the term "final agency action" or the term "agency action.""  456 F.3d at 187.  Accordingly, this Court's interpretation of *Trudeau* does require that Plaintiff state a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.  *See, e.g., Mackinac Tribe v. Jewell,* 87 F. Supp. at 143, finding that:

> To the extent that Plaintiff Mackinac Tribe is here seeking to proceed under the IRA, it is sufficient that its complaint alleges that the agency has failed to act where the law provides it must, and Plaintiff need not identify a final agency action in order to avail itself of APA's sovereign immunity waiver, despite Defendant's assertions to the contrary.  The Court is mindful, however, that "other limitations on judicial review or the power or duty of the court to dismiss any action or deny any relief on any other appropriate legal or equitable ground" may nevertheless preclude this action. 5 U.S.C. § 702.

Assuming *arguendo* that Kialegee's claim in Paragraph 68 of its Amended Complaint that Federal Defendants have "repeatedly violated 25 U.S.C. § [5123](f) by blocking the Kialegee from jurisdiction on lands located within the Creek Reservation" is enough to satisfy "stating a claim" for purposes of applying Section 702 to effect a waiver of sovereign immunity, the Court next turns to whether Kialegee has identified a cause of action and stated a claim upon which relief can be granted.

### C.  Cause of Action

The Court of Appeals in *Trudeau* explained that whether Plaintiff states a claim upon which relief can be granted:

> depends in part on whether there is a cause of action that permits plaintiff to invoke the power of the court to redress the violations of law that he claims that FTC has committed. *See generally Davis v Passman,* 442 U.S. 228, 239-40 & n. 18, 999 S. Ct. 2264, 60 L. Ed. 2d 846 (1979).  It also depends on whether the allegations of [plaintiff's] complaint are legally sufficient to state the violations he claims.  We consider the cause of action question [first] and the sufficiency of [plaintiff's] claims [next].

*Trudeau*, 456 F. 3d at 188.[8]

As a preliminary matter, Federal Defendants assert that Plaintiff's seeming reliance on either 28 U.S.C. Section 1331 or Section 1362 as a cause of action is misplaced. *See* Fed. Defs.' Mem. at 15-16; *see also McGuirl v. United States*, 360 F. Supp. 2d 129, 131 (D.D.C. 2004) ("[S]ection 1331 requires that the plaintiff[ ] allege another basis for jurisdiction in addition to section 1331, i.e., a cause of action created by a substantive federal statute."), *aff'd per curiam*, 167 Fed. App'x 808 (D.C. Cir. 2005); *Little River Band of Ottawa Indians v. Nat'l Labor Relations Bd.*, 747 F. Supp. 2d 872, 883 (W.D. Mich. 2010) ( noting that "invoking § 1362 does not change a plaintiff-tribe's duty to show that its complaint raises a substantial federal question").

Furthermore, Federal Defendants dispute Plaintiff's presumed reliance on the Creek Nation treaties as a cause of action, on grounds that Plaintiff makes no attempt to show whether such treaties provide it with a private right of action. *See McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 489 (D.C. Cir. 2008) (Treaties, "even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.")

Plaintiff affirmatively states that its cause of action is not based upon the Administrative Procedure Act. Pl.'s Opp'n at 15. Plaintiff relies instead upon the Indian Reorganization Act, 28 U.S.C. Section 5123, and asserts that, under that Act, "Kialegee specifically has a cause of action against the government of the United States if it enhances, or diminishes the privileges and immunities available to an Indian tribe relative to other federally recognized tribes." Pl.'s Opp'n at 17. Pursuant to Section 5123(f),

> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 . . ., or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies,

---

[8] Ultimately, the Court of Appeals affirmed the judgment of the district court dismissing plaintiff's complaint for failure to state a claim upon which relief could be granted.

16

enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. Section 5123(f).

Federal Defendants acknowledge that "detailed factual allegations" are not necessary to withstand a 12(b)(6) motion, *Twombly*, 550 U.S. at 555, but assert that Plaintiff must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citations omitted). Plaintiff contends that Kialegee "has set forth the actions of Defendants, explained why it violates that law and how this has deprived and harmed Kialegee — that is, Defendants expressly refuse to acknowledge that Kialegee has jurisdiction over its lands as a successor to the historic Creek Nation." Pl.'s Opp'n at 18-19. Plaintiff argues further that it "need not plead this with specificity, as under Rule 9(b), rather, Kialegee's Amended Complaint need only comport with the notice-pleading requirements of Rule 8" and it has done this by putting "Defendants on notice of what Kialegee alleges to be wrong and its recourse sought for the same[,]" in part by referencing a letter in which the rights of other Creek successors are acknowledged, where such letter includes "findings from Defendant the Department of Interior."[9] Pl.'s Opp'n at 19.

Plaintiff indicates that it has constructed a restaurant facility known as the Embers Grill, which is located on an Indian allotment within the Creek Reservation and within the city limits of Broken Arrow, Oklahoma, and Plaintiff claims jurisdiction over this land, in common with the

---

[9] Attached as Exhibit E to the Amended Complaint, ECF No. 27-1, is a lengthy letter from the Chairman of the National Indian Gaming Commission to the Tribal Chairman of the Poarch Band of Creek Indians. The letter begins by indicating that a review has been conducted and the NIGC "continue[s] to consider the Tribe's Tallapoosa site to be Indian lands on which the Tribe may conduct gaming." Ex. E at 1. This letter is discussed in detail in Paragraph 60 of the Amended Complaint, but the Court notes that when Plaintiff amended its Complaint in this case, it no longer named The Chairman of the National Indian Gaming Commission as a defendant.

17

other recognized Creek tribes in Oklahoma and pursuant to "various Creek Treaties with the United States read in context with the Indian Canon of Construction." Am. Compl. ¶¶ 56-57. Plaintiff asserts also that "Defendants have repeatedly violated 25 U.S.C. Section [5123](f) by blocking the Kialegee from jurisdiction on lands located within the Creek Reservation," but this general assertion fails to state a claim that supports Plaintiff's request for declaratory and injunctive relief. What is missing from the Amended Complaint is any connection between Plaintiff's claim to jurisdiction over the land where the restaurant facility is located, and any actions taken by Defendant in response to such claim of jurisdiction, which violate Section 5123, or alternatively, any other actions taken by the Defendant that violate Section 5123, which are actionable by the Plaintiff. More succinctly, Plaintiff's Amended Complaint fails to provide this Court with any information about how and when the Defendants have "block[ed] the Kialegee from jurisdiction" over land with the effect that the Kialegee's privileges and immunities have been diminished relative to other federally recognized tribes. Plaintiff's allegations against Defendants — presumably relating to its cause of action pursuant to 25 U.S.C. Section 5123 — are fleshed out in somewhat more detail in the context of the briefing on Defendants' Motion to Dismiss.

In its Opposition, Plaintiff refers to three specific instances where Defendants have failed to recognize Kialegee as a Creek successor having jurisdiction over its lands: (1) a pending appeal before the Indian Board of Indian Appeals ("IBIA") of an April 26, 2017 decision by the Bureau of Indian Affairs, Eastern Oklahoma Regional Director, declining to approve a resolution of the Kialegee Tribal Town Business Committee on grounds that Kialegee lacks jurisdiction over any area of Indian Country over which it could enact and apply a liquor ordinance; (2) a 1991 IBIA decision captioned *Kialegee Tribal Town of Oklahoma v. Muskogee Area Dir., Bureau of Indian*

18

*Affairs*, 19 IBIA 296, 303 (1991), upholding a decision by the Regional Director that Plaintiff did not exercise jurisdiction over the Muscogee (Creek) Nation lands; and (3) a May 24, 2012 Memorandum regarding review by the National Indian Gaming Commission ("NIGC") of a proposed gaming facility in Broken Arrow, Oklahoma (the "proposed Site"), which concludes that the facility "does not qualify as Kialegee's Indian lands eligible for gaming because Kialegee has not established that it has legal jurisdiction over the Proposed Site for purposes of [the Indian Gaming Regulatory Act]," and expressly stating that "the Department of the Interior (DOI), Office of the Solicitor, concurs with this opinion."[10]  *See* Pl.'s Opp'n at 19-21; *see also* May 24, 2012 Memorandum.

In their Reply, Defendants explain why none of these three instances is currently actionable by the Plaintiff, for the following reasons: (1) the Regional Director's April 26, 2017 decision is on appeal before the IBIA, and Plaintiff must exhaust its administrative remedies before seeking a judicial review of that decision;[11] (2) any challenge to the 1991 decision is untimely because, pursuant to 28 U.S.C. Section 2401(a), a civil action against the United States is barred if not filed within six years after the right of action accrues; and (3) the May 24, 2012 Memorandum is not an agency action for which Plaintiff may seek judicial review as it does not constitute a "final agency action" pursuant to 25 U.S.C. Section 2714, nor has Plaintiff demonstrated how the 2012 Memorandum "violates the IRA in any way."  *See* Fed. Defs.' Reply at 5-7.

This Court agrees with the Federal Defendants' analysis of these three "instances," and as

---

[10] Plaintiff indicates that this Memorandum is part of the public record and provides a website address for the NIGC website, which contains the May 24, 2012 Memorandum.  Pl.'s Opp'n at 21, n. 9.

[11] Federal Defendants indicate that "[i]t may be that in the future, after the IBIA issues its final decision on Plaintiff's challenge to the Regional Director's April 26, 2017 decision, Plaintiff will have an action for which it may want to seek judicial review[.]"  Fed. Defs' Reply at 8.

such, finds that while the Plaintiff has alleged that it has a cause of action pursuant to 28 U.S.C. Section 5123, Plaintiff has not indicated any conduct by Federal Defendants that is actionable under this cause of action. A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," which "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556-57, 127 S. Ct. 1955); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (same). In the instant case, Plaintiff alleged initially a more specific claim against the Federal Defendants (and then-defendant NIGC), based on the development of the Bruner allotment and its jurisdiction over that land, but because that claim was not yet ripe, Plaintiff amended its Complaint, with the effect that its claim against the Federal Defendants was made more general. It is not enough for Plaintiff to simply claim that a statute has been violated, which affects Plaintiff in a negative way, and to make conclusory statements regarding Federal Defendants' position. Instead, Plaintiff needs to allege with some specificity the actions allegedly taken by Federal Defendants, which give rise to Plaintiff's cause of action. Accordingly, because this Court finds that Plaintiff fails to state a claim, its Amended Complaint shall be dismissed without prejudice

DATED: September 7, 2018

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE